49 N.J. 174 (1967)
229 A.2d 505
IN THE MATTER OF THE FORMAL COMPLAINT OF BROTHERHOOD OF RAILROAD TRAINMEN, BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND BROTHERHOOD OF LOCOMOTIVE FIREMEN, ETC., ALLEGING UNWARRANTED, UNREASONABLE AND UNSAFE CONDITIONS, ETC.
THE PENNSYLVANIA RAILROAD COMPANY AND PENNSYLVANIA READING SEASHORE LINES, APPELLANTS,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES AND BROTHERHOOD OF RAILWAY TRAINMEN, ET AL., RESPONDENTS.
The Supreme Court of New Jersey.
Argued February 13, 1967.
Decided April 24, 1967.
*176 Mr. Richard N. Clattenburg of the Pennsylvania Bar argued the cause for appellants (Messrs. O'Mara, Schumann, Davis & Hession, attorneys; Messrs. Charles E. Mechem and William P. Quinn of the Pennsylvania Bar, on the brief).
Mr. James M. Davis, Jr. argued the cause for respondent Brotherhoods (Messrs. Powell & Davis, attorneys).
Mr. Alan B. Handler, First Assistant Attorney General, argued the cause for respondent Board of Public Utility Commissioners (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Avrom J. Gold, Assistant Attorney General, and Mr. William Gural, Deputy Attorney General, of counsel).
The opinion of the court was delivered by JACOBS, J.
Effective October 18, 1964, the Railroads made rule changes which included the elimination of flagging requirements in automatic block signal territory and in manual block signal territory when absolute block is in effect. Thereafter the Brotherhoods filed a complaint before the Board of Public Utility Commissioners primarily attacking the rule changes as not consistent with reasonable safety. After due hearings, a hearing examiner submitted a report with various recommendations including one that the preexisting flagging requirements be reinstated. On January 12, 1966, the Board adopted the examiner's recommendations and entered an order which directed, inter alia, that the Railroads (a) "restore Rules 99 and 152 to the wording in effect prior to October 18, 1964, insofar as said wording pertains to protection by flagging"; and (e) "maintain headlights on each train in conformity with the applicable regulations of the Interstate Commerce Commission." The Railroads appealed to the Appellate Division and we certified before argument there.
The Railroads have long maintained block systems for regulating train movements so as to space trains properly and avoid collisions. A block is a length of track within defined *177 limits and may be controlled manually or automatically. In the manual block system, permission to enter a block and advice as to whether it is clear is given by an employee, normally by a signal indication at the entrance to the block. In manual absolute block territory (Rule 316), the train is signaled to stop at the entrance of the block containing the preceding train, whereas in manual permissive block territory (Rule 317) it may be permitted to enter the block with speed restriction and warning as to the presence of the preceding train. In automatic block territory, signal indications as to the conditions in each block are given automatically. Electrical circuits in the rails detect the presence of trains and the signals at the entrances to the blocks are governed accordingly. Automatic block signals are so set up as to show the conditions of more than one block ahead. Where the block about to be entered contains a preceding train, the automatic signal is designated as "stop and proceed" which calls upon the engineer to stop and then to proceed with caution at restricted speed not exceeding 15 miles per hour.
In manual block territory, the employee may of course display a false signal which may contribute to a disastrous collision. The possibility of such human error is self-evident and was acknowledged by the Railroads during the hearings before the examiner. Similarly, in automatic block territory, there may be false signals resulting from mechanical or electrical failures and through the malfunction of safety devices. During the hearings, the Railroads introduced evidence as to the high degree of reliability of the automatic signal system. However, they acknowledged that through the years there have been many failures in the operation of the automatic system but stressed that most of these resulted in more restrictive and therefore non-dangerous signals, rather than in "false-proceed" signals which would dangerously call for less restriction than warranted by the actual conditions. During the hearings, the Pennsylvania Railroad's Engineer, Signals and Catenary, testified that from 1955 to 1964 it reported to the Interstate Commerce Commission, false proceed failures *178 on its entire system which ranged between 3 and 10 in number per annum. During the same period, 6 rear-end accidents occurred in New Jersey and in some of those the absence of flagging was reported as a possible cause.
Prior to October 18, 1964, Rule 99 directed that when a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals, "a sufficient distance to insure full protection," placing torpedoes and, when necessary, lighted fusees. A note stipulated that when operating under automatic block system rules, Rule 99 will have been complied with "when full protection is afforded against trains moving at restricted speed." The October 18th changes provided (1) that when trains are operating under automatic block system rules, "the requirements of Rule 99 do not apply for following movements on the same track," and (2) that when trains are operating under manual block system rules, "the requirements of Rule 99 will not apply for following movements on the same track when Rule 316 is in effect, except when required by train order or timetable instructions."
Several witnesses testified on behalf of the Brotherhoods to the effect that the elimination of the flagman removed an additional safety protection which was reasonably required. They referred to a relatively recent accident which might have been averted by proper flagging activity, and to various accident investigations which have disclosed rusty tracks and other equipment deficiencies likely to lead to failures in the automatic system. Several witnesses on behalf of the Railroads took the position that the elimination of the flagman would increase rather than decrease safety by placing full rather than divided responsibility on the engineer. Mr. Rathvon, Manager of Operating Rules of the Pennsylvania, put the matter this way: "I think that by removing the flagman we have removed the temptation for the engineman to rely on still another signal after he had been given a signal that the track is occupied. I believe in this respect we have created a *179 rule that will improve the safety of our operations significantly."
The hearing examiner, in recommending that Rule 99 be restored to its wording prior to October 18th insofar as it applied to protection by flagging, flatly rejected the position of the Railroads on the safety issue, noting that "it is evident that the signal systems both automatic and manual are not perfect, and that any means of maintaining a check on possible errors is desirable." He also rejected the change in Rule 152 which eliminated the flagman requirement in cases where trains crossed over to or obstructed other tracks, pointing out that it would remove any responsibility for protection from the train crew and would place it "solely upon the tower operator, who may be located many miles from the scene." He expressed the view that the elimination of the flagman requirement would be "a reduction in the safety of operation."
In its decision adopting the examiner's recommendations, the Board of Public Utility Commissioners referred not only to the testimony before him but also to earlier investigations by the Board of railroad accidents which were found by it to have been caused by human, electrical or mechanical failures or by the failure of safety devices to produce expected results. Cf. Pennsylvania Railroad Co. v. Dept. of Public Utilities, 14 N.J. 411, 427 (1954). The Board pointed out that consideration must be given "to the use of every reasonable, incremental safety measure available, for this may be the very margin needed to prevent a serious accident." It recognized that the use of flag protection may cause some delay to trains but concluded that the safety aspects of rear-end flagging outweigh that consideration and that through flagging "a human or mechanical failure otherwise of tragic consequence may be overcome." It did not accept the Railroads' contention that the elimination of rear-end flagging was actually a safety improvement but determined instead that the flagging requirements of Rules 99 and 152 should be reinstated as reasonably essential to the safety of the traveling public and railroad personnel.
*180 The Railroads urge that the Board's order restoring the flagging requirements was not supported by substantial evidence in the record and was "an abuse of administrative discretion." The Board is expressly authorized by statute to impose reasonable safety requirements on railroads operating within New Jersey. R.S. 48:2-23; R.S. 48:2-25; Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra, 14 N.J., at p. 425. R.S. 48:2-23 provides that the Board may require any public utility to furnish safe, adequate and proper service; and R.S. 48:2-25 provides that it may fix just and reasonable practices to be followed by any public utility. See also R.S. 48:2-13; R.S. 48:3-3. An order of the Board fixing safety requirements may be reviewed judicially but will not be upset where there was reasonable basis for its entry. R.S. 48:2-46; In re Greenville Bus Co., 17 N.J. 131, 137-138 (1954); Penna.-Reading Seashore Lines v. Bd. of Pub. Utility Com'rs, 13 N.J. Super. 540, 548-549 (App. Div.), affirmed 8 N.J. 85 (1951).
In the Pennsylvania case, 14 N.J. 411, this Court made observations which have pertinence here. We pointed to the high and continuing public responsibility of the Board to insure that railroads provide safe transportation; we indicated that the Board need not await the happening of an accident before it acts to compel an additional safety measure which it finds to be reasonably necessary for the protection of the public; and we noted that the value of certain precautionary requirements may be self-evident and not require affirmative proof. 14 N.J., at p. 430. Here, the Railroads seem to have placed the primary stress on the contention that the elimination of the flagging requirements would increase rather than decrease the safety of operations. And while several railroad employees expressed their opinions to that effect, they did not produce any significant factual documentations or any independent expert studies in support. It appears highly unlikely that properly trained engineers would lessen their caution or their attentiveness because the block signals were being supplemented by flagging. And it appears *181 highly likely that properly conducted flagging would serve, at least to a degree, as a safety measure against the exceptional failures in both the automatic and manual block territories; indeed the warning potential afforded by suitable flagging, flares and the like, may be said, as in the Pennsylvania case (14 N.J., at p. 430), to be self-evident. In any event, the showing before us affords no sound basis for differing with the Board's finding that the flagging requirements had affirmative safety aspects which outweighed the minor costs and inconveniences incident to their reinstatement.
There is no doubt as to the constitutional power of our Legislature to impose reasonable safety requirements on railroads operating in New Jersey, provided there is no substantial interference with interstate commerce or intrusion into a field which Congress has occupied completely. See Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra, 14 N.J., at p. 425; see also Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., 382 U.S. 423, 429, 86 S.Ct. 594, 15 L.Ed.2d 501, 505 (1966); Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 141-143, 929, 83 S.Ct. 1210, 10 L.Ed.2d 248, 256-267 (1963). The Railroads, while conceding that the Board's requirements are not in actual conflict with federal statutory or regulatory requirements, contend nonetheless that they are invalid (1) because Congress has "preempted" the field by its passage of Section 25 of the Interstate Commerce Act (49 U.S.C.A. § 26) and (2) because they impose "an unlawful burden on Interstate Commerce in violation of the Federal Constitution, Art. 1, Sect. 8."
On the issue of preemption the Railroads rely most heavily on Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), where the Supreme Court struck down state requirements for cab curtains and automatic doors to fire boxes, on the ground that the Congressional enactment manifested "the intention to occupy the entire field of regulating locomotive equipment." 272 U.S., at p. 611, 47 S.Ct., at p. 209, 71 L.Ed., at p. 438; see also *182 Southern R. Co. v. Railroad Commission, 236 U.S. 439, 446, 35 S.Ct. 304, 59 L.Ed. 661, 665 (1915); Pennsylvania R. Co. v. Public Service Commission, 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142, 1145 (1919). Napier has never been applied as broadly as the Railroads contend (cf. Terminal R. Asso. of St. Louis v. Brotherhood of R. Trainmen, 318 U.S. 1, 4, 63 S.Ct. 420, 87 L.Ed. 571, 576 (1943); Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L.Ed. 1915, 1922 (1945)); in any event it dealt, not with a supplemental local emergency safety device, such as flagging, but with equipment attached to the locomotive which passes through from state to state and with respect to which the national interest in uniformity is vital and paramount. Similarly, the very Congressional language (49 U.S.C.A. § 26(b)) points to the block signal systems themselves and to similar appliances where national uniformity is the concern rather than to local safety requirements which do not impair the design or sweep of the federal regulations.
In Florida Lime & Avocado Growers v. Paul, supra, the Supreme Court pointed out that federal regulation of a field in commerce should not be deemed preemptive of state power in the absence of persuasive reason  "either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, e.g., Huron Portland Cement Co. v. [City of] Detroit [362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852, 78 A.L.R. 2d 1294]." 373 U.S., at p. 142, 83 S.Ct., at p. 1217, 10 L.Ed.2d, at p. 257. And in Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., supra, the Supreme Court, in upholding a state full crew law as against a claim of preemption, noted that in the absence of Congressional legislation as to the number of crew members, "the States have extensive power of their own to regulate in this field, particularly to protect the safety of railroad employees and the public." 382 U.S., at p. 429, 86 S.Ct., at p. 597, 15 L.Ed.2d, at p. 505. Indeed, it may be said that state regulatory provisions having local safety as their objective are the least *183 likely to be held preempted. See Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 442-444, 80 S.Ct. 813, 4 L.Ed.2d 852, 855-856 (1960); cf. Railroad Transfer Service v. City of Chicago, 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (1967); see also Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra, where we stated that we were not convinced "that there is merit to the Pennsylvania's contention that Congress has occupied the field of automatic block signals to the total exclusion of any state safety requirements bearing thereon." 14 N.J., at p. 434.
We reject not only the Railroads' preemption contention but also their claim that the Board's restoration of the flagging requirements constituted an undue burden on interstate commerce. In Southern Pacific Co. v. State of Arizona, supra, the Supreme Court pointed out that much had been left to the states for the regulation of subjects of local state concern and that the significant matters were the "nature and extent of the burden" which the state's safety regulations imposed on interstate commerce, and the "relative weights of the state and national interests." 325 U.S., at p. 770, 65 S.Ct., at p. 1521, 89 L.Ed., at p. 1925. Insofar as the flagging requirements here are concerned, it may fairly be said that the local safety interest is great, the need for uniformity is slight, and the burden on interstate commerce is minimal. Indeed at the close of their brief, the Railroads assert that if they believed that the Board's order enhanced the safety of rail operations in the slightest degree they would have "no grounds or reasons to oppose the order." The Board, as the expert administrative body charged by the Legislature with primary responsibility in the field, has found that safety will be enhanced and the record furnishes no persuasive ground for a different judicial finding or a holding of unconstitutionality. See Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra, where, after citing State of California v. Thompson, 313 U.S. 109, 113, 61 S.Ct. 930, 85 L.Ed. 1219, 1221 (1941), and other pertinent cases, this Court said:
"Finally, the Pennsylvania contends that the order violates the Commerce Clause of the Federal Constitution. We are satisfied that *184 it does not. The requirements of the order, to the extent sustained, do not substantially impair the free flow of commerce between the states or intrude onto any field occupied completely by Congress. They are simply local safety measures which are reasonably designed to protect the traveling public within our State. Their advantages in guarding against accidents appear substantial and their disadvantages, measured in the asserted terms of expense and inconvenience, appear insubstantial. We consider that they fall well within the controlling decisions, listed by Justice Stone in [State of] California v. Thompson, supra, which have sustained many state safety regulations of comparable nature." 14 N.J., at p. 437.
See also Huron Portland Cement Co. v. City of Detroit, supra, 362 U.S., at pp. 443-445, 80 S.Ct., at p. 913, 4 L.Ed.2d, at pp. 856-857; Head v. New Mexico Board of Examiners, 374 U.S. 424, 428, 83 S.Ct. 1759, 10 L.Ed.2d 983, 987 (1963); cf. Terminal R. Asso. of St. Louis v. Brotherhood of R. Trainmen, supra, 318 U.S., at p. 8, 63 S.Ct., at p. 420, 87 L.Ed., at p. 578.
The attack by the Railroads on paragraph (e) of the Board's order involves different considerations than those presented by the reinstatement of the flagging requirements. That paragraph directed that the Railroads maintain headlights on each train in conformity with the applicable regulations of the Interstate Commerce Commission. The headlights are of course part of the railroad equipment which moves through from state to state and the federal commission has prescribed detailed regulations with respect to them. 49 C.F.R. § 91.231; see Brown v. Chicago, R.I. & P.R. Co., 108 F. Supp. 164 (N.D. Iowa 1952). Here uniformity is a matter of prime consideration and there is no suggestion that the State agency could impose different headlight requirements. It has not sought to do so. The position of the Railroads is that the State agency has no power to adopt and enforce its own headlight requirements (even though they coincide with the federal regulations) and thereby burden them with procedures and penalties beyond those imposed by the federal agency. See R.S. 48:2-41; R.S. 48:2-42. Although earlier decisions may be referred to (cf. Southern R. Co. v. Railroad Commission, supra, 236 U.S. 439, 35 S.Ct. 304, 59 L.Ed. 661; Charleston & W.C.R. Co. v. Varnville *185 Furniture Co., 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137 (1915)), they should be considered in the light of recent reaffirmations of People of State of California v. Zook, 336 U.S. 725, 730, 69 S.Ct. 841, 844, 93 L.Ed. 1005, 1010 (1949), where the Court held that "identity does not mean the automatic invalidity of State measures." See Colorado Anti-Discrimination Comm. v. Continental Air Lines, 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84, 90 (1963), where the Supreme Court noted that in order to hold that a "state statute identical in purpose with a federal statute is invalid under the Supremacy Clause, we must be able to conclude that the purpose of the federal statute would to some extent be frustrated by the state statute." See Florida Lime & Avocado Growers v. Paul, supra, 373 U.S., at p. 142, 83 S.Ct., at p. 1210, 10 L.Ed.2d, at p. 256.
We are not prepared to say that the Board could not under any circumstances adopt headlight regulations which coincide with the federal regulations, but are nonetheless satisfied that the record before us calls for vacation of paragraph (e) of the order. Though there was some testimony with respect to headlights, there was no suggestion that the Railroads were not willing to remedy quickly any headlight deficiencies called to their attention. There was no substantial evidence that there were actual violations of the federal regulations nor was there any finding of such violations either by the hearing examiner or by the Board itself. Indeed the only comment in the Board's decision was that improved headlights were being installed and that the record contained descriptions of various headlights but "no suggestion as to appropriate standards of construction or degree of brilliance." The Board's brief contains nothing addressed to the defense of the paragraph or by way of answer to the Railroads' attack on it. On the particular showing before us we find no reasonable need or present occasion for paragraph (e) and it will be exscinded. See 60 Harv. L. Rev. 262, 265 (1946). Subject to that modification the Board's order is:
Affirmed.
*186 For affirmance  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN  6.
For reversal  None.