Bessemer and Lake Erie Railroad Company, Appellant, *v.* Pennsylvania Public Utility Commission.

340

Argued January 4, 1968. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument refused July 15, 1968. █

*Richard N. Clattenburg,* with him *Blair S. McMil-
lin,* and *Reed, Smith, Shaw & McClay, Harris J. Latta,*

John A. Shrader, S. Keene Mitchell, Jr., William P. Quinn, Gordon E. Neuenschwander, W. L. Hill, Jr., Donald A. Brinkworth, and Thomas J. Smith and John F. Reilly, of the New York Bar, and Robert O. Smith, Jr. and Rene J. Gunning, of the Maryland Bar, and D. F. Donovan, of the Ohio Bar, for railroads, appellants.

William A. Goichman, Assistant Counsel, with him Louis J. Carter and Edward Munce, Assistant Counsel, and Joseph C. Bruno, Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

T. P. Shearer, with him Brandon & Shearer, for intervening appellee.

OPINION BY MR. JUSTICE ROBERTS, May 21, 1968:

With the advent of mechanical devices for controlling the movement of more than one train on a single track, many railroads in Pennsylvania have abandoned the old system of flagging, whereby a man was dispatched to the rear of a halted train to place flares and wave flags, thus insuring against rear end collisions. The abandoning of the flaggers forms the basis of this controversy.

On July 22, 1964, a union filed a complaint before the Pennsylvania Public Utility Commission against the Pittsburgh and Lake Erie R. R. Co., alleging that the railroad had amended its rule 99 to eliminate flagging in those areas controlled by automatic signal devices, that this amendment has resulted in an unsafe warning procedure, and that the interests of public safety required that the commission order the railroad to reinstate its flagging controls. In October of the same year, the same union filed a "petition" against all railroads operating in Pennsylvania, including the P. & L. E., alleging that other railroads have also

342

eliminated flagging, and urging the Commission to promulgate a rule to require flagging in *all* areas where a train stops under circumstances in which it may be overtaken by another train. As a result of these two actions, the commission heard extensive testimony by experts from both the union and the railroads, and, as a result of this testimony, issued its Rule 16 on November 22, 1965, requiring flagging in all areas, subject to certain exceptions dealing with passenger train stops, interlocking plants, storage yards, and those semi-automatic signal systems in which oncoming trains are required to come to a complete stop. The railroads immediately took an appeal to the Superior Court.

Before argument could be heard, the union and the commission successfully petitioned the Superior Court to remand the case for further hearing on the ground that many of the Rule 16 exceptions were unclear. As a result of this remand, a new, amended version of Rule 16 was issued on December 19, 1966; this new rule contains no specific exceptions to the flagging requirements. In an opinion by President Judge ERVIN, the Superior Court affirmed the commission's order. 210 Pa. Superior Ct. 7, 232 A. 2d 220 (1967), and we granted allocatur, limiting argument, however, to the issue of whether §25 of the Interstate Commerce Act, 49 U.S.C. §26,[1] has preempted state regulation dealing

[1] Section 25 of the Interstate Commerce Act provides in pertinent part as follows:

*"Order to install systems, etc.; modification; negligence of carrier*

"(b) The Commission may, after investigation, if found necessary in the public interest, order any carrier within a time specified in the order, to install the block signal system, interlocking, automatic train stop, train control, and/or cab-signal devices, *and/or other similar appliances, methods, and systems intended to promote the safety of railroad operation* which comply with spec-

with flag protection. Having thoroughly reviewed the applicable statutes and judicial precedents, we hold that federal legislation *has* preempted any state intervention in this particular area, a holding supported by three separate reasons.

First, there can be no doubt whatsoever that the mechanical devices specifically required by §25 per-

---

ifications and requirements prescribed by the Commission, upon the whole or any part of its railroad such order to be issued and published a reasonable time (as determined by the Commission) in advance of the date for its fulfillment: *Provided,* That block signal systems, interlocking, automatic train stop, train control, and cab-signal devices in use on August 26, 1937, or such systems or devices hereinafter installed may not be discontinued or materially modified by carriers without the approval of the Commission: . . .

"*Filing report on rules, standards, and instructions with Commission; time; modification*

"(c) Each carrier by railroad shall file with the Commission its rules, standards, and instructions for the installation, inspection, maintenance, and repair of the systems, devices, and appliances covered by this section within six months after August 26, 1937, and, after approval by the Commission, such rules, standards, and instructions, with such modifications as the Commission may require, shall become obligatory upon the carrier: *Provided, however,* That if any such carrier shall fail to file its rules, standards, and instructions the Commission shall prepare rules, standards, and instructions for the installation, inspection, maintenance, and repair of such systems, devices, and appliances to be observed by such carrier, which rules, standards, and instructions, a copy thereof having been served on the president, chief operating officer, trustee, or receiver, of such carrier, shall be obligatory: *Provided further,* That *such carrier may from time to time change the rules, standards, and instructions herein provided for, but such change shall not take effect and the new rules, standards, and instructions be enforced until they shall have been filed with and approved by the Commission:* *And provided further,* That the Commission may on its own motion, upon good cause shown, revise, amend, or modify the rules, standards, and instructions prescribed by it under this subsection, and as revised, amended, or modified they shall be obligatory upon the carrier after a copy thereof shall have been served as above provided." (Emphasis marked "*" supplied.)

form the *exact same function* that manual flagging is intended to perform (i.e., increasing safety by preventing rear end collisions) ; second, the language used in §25 is broad enough to indicate that Congress has chosen to regulate the entire field of rear end collision prevention; and third, the Supreme Court of the United States has announced the rule that where federal language is broad enough to indicate preemption, a state law cannot escape interdiction on the ground that it does not *conflict* with the federal regulations actually passed.

The first reason for our decision today, that §25 devices perform the same function as flagging, needs' little expansion. What is *most* significant about this identity of functions, however, is this. If one looks behind the actual mechanical devices themselves, §25 is really nothing more than a federal statute designed to keep one train from running into the rear of another. Congress having once determined how best to avoid this type of disaster, it is no longer open to the states to decide that the federal protections are inadequate, and that additional safety measures must be taken by interstate railroads whenever their trains run through Pennsylvania.

Furthermore, the language of §25 indicates that the Interstate Commerce Commission (now the Department of Transportation [D.O.T.] )[2] has the power to require flag protection to supplement the safety features of mechanical collision prevention devices. In addition to requiring those types of automatic devices set out in the opening sentence of §25(b), the Commission may also require "other similar appliances, methods, and systems intended to promote the safety of railroad op-

_____
[2] On April 1, 1967 all railroad safety regulations formerly administered by the I.C.C. were placed under the aegis of the Department of Transportation, Federal Railroad Administration.

eration. . . ." The argument advanced by appellees that the §25 language is limited only to mechanical devices, whereas flagging cannot be classified as a device at all, falls flat in the face of this language. For the statute, in addition to permitting the Commission to require "appliances" not specified in the statute itself, also permits the establishment of additional "methods and systems" to prevent rear end collisions. Flagging can certainly be classified as either a "method" or a "system."

Admittedly, neither the ICC nor the DOT has ever issued any blanket regulations pursuant to §25 covering flag protection. However, not only is the federal agency's failure to regulate flagging itself not dispositive when the issue of preemption is raised, see cases cited and discussed infra, but furthermore, the ICC, in 1947, *did* issue an order requiring railroads under certain specified circumstances to supplement their automatic controls with flag protection. See Order No. 29543, issued pursuant to *Appliances, Methods, and Systems Intended To Promote Safety of Railroad Operation*, 268 I.C.C. 547, 560-61 (1947).[3]

---

[3] Order No. 29543 requires all Class I and all switching and terminal railroads subject to the Interstate Commerce Act to install either automatic or manual block control systems on those parts of the lines where passenger trains operate at more than 60 mph, or where freight trains operate at more than 50 mph. The order further requires that if the manual block control system is used it shall be supplemented by flag protection whenever a passenger train is admitted to a block occupied by another train, or a passenger train occupies a block into which any other train seeks entry.

The Department of Transportation, by two letters dated July 6, 1967 and July 31, 1967, informed counsel for appellant railroads that this order is still in effect, and was adopted on April 1, 1967 by the Federal Railroad Administration. Prior to that date, the order had been followed in two cases. See *In the Matter of Application for Approval of Proposed Modifications of Systems or*

It is certainly too late in the development of constitutional law to say that Congress may not preempt an entire field by the passage of a broad based statute, even though the regulations passed pursuant to that statute do not in fact cover every possible situation. Moreover, once such a statute is passed, and the intention to preempt state law in the area becomes manifest, the various states may not pass legislation even supplemental to the federal rules, so long as the area affected by these supplemental acts coincides with the federal bailiwick. For example, in *Napier v. Atlantic Coast Line R.R. Co.,* 272 U.S. 605, 47 S. Ct. 207 (1926), two state statutes which required automatic fire doors and cab curtains on locomotives were declared unconstitutional on the ground that the federal Locomotive Boiler Inspection Act was the exclusive pronouncement on mandatory locomotive equipment. No one in *Napier* contended that the federal act actually *had* any provisions relating to such cab curtains and fire doors. The Supreme Court nevertheless held that the states were powerless to supplement the federal equipment requirements with additional safeguards of their own. The appellee in the present case attempts to distinguish *Napier* by relying on *In Re Complaint of Brotherhood of R.R. Trainmen v. Public Utility Commissioners of New Jersey,* 49 N.J. 174, 229 A. 2d 505 (1967). However, in our view, New Jersey's explanation of *Napier* is unsatisfactory.

According to the *Brotherhood* decision, *Napier* does not control because it dealt with equipment actually attached to the locomotive and passing from state to

*Devices under Paragraph (b), Section 25 of the Interstate Commerce Act, as amended* (Pennsylvania Railroad Company), 293 I.C.C. 765, 768 (1954) ; *In the Matter of Application for Approval of Proposed Modifications of Systems or Devices under Paragraph (b), Section 25 of the Interstate Commerce Act, as amended* (Pennsylvania-Reading Seashore Lines), 298 I.C.C. 503, 506 (1956).

state, rather than with a requirement styled by the New Jersey Court as a "supplemental local emergency safety device." We believe this to be a distinction without legal substance. Just as in the present case, an attempt was made in *Napier* to show that the state law was aimed at a completely different evil than that covered by the Boiler Inspection Act. It was there contended that the federal locomotive requirements were intended to keep trains from having accidents, whereas the local fire door and cab curtain statutes were designed for engineer health and safety. That argument failed to persuade the Supreme Court of the United States. So also is this Court unmoved by an argument based on the purely "supplemental" nature of flagging. In fact, it would seem that *Napier* is a much *weaker* case for a finding of federal preemption than this insofar as the state statute there *was* intended to remedy a different problem than the federal law, whereas in the present case, the appellee's best argument is that flagging "supplements" automatic devices.

Finally, on this issue of supplemental state legislation, we shall follow the case of *Pennsylvania R. Co. v. Public Service Commission of Pennsylvania,* 250 U.S. 566, 40 S. Ct. 36 (1919). Pennsylvania had enacted a statute requiring cabooses to be equipped with rear platforms of certain minimum dimensions, even though the applicable federal statute permitted cabooses with no such platforms. In answer to the argument that the Pennsylvania statute merely "supplemented" the federal law by making cabooses safer, Mr. Justice HOLMES had only to say: "when the United States has exercised its exclusive powers over interstate commerce as far as to take possession of the field, the States no more can supplement its requirements than they can annul them." 250 U.S. at 569, 40 S. Ct. at 37.

Agreeing with this great Justice, and believing that his words are just as applicable to the present case, we reverse the orders of the Superior Court and Public Utility Commission.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion hitches the wagon of its argument to the star of Oliver Wendell Holmes by quoting the illustrious jurist who said: "[w]hen the United States has exercised its exclusive powers over interstate commerce as far as to take possession of the field, the States no more can supplement its requirements than they can annul them."

This is epigrammatic, it is brilliant,—but it is untrue.

It is untrue that, by providing an additional measure of safety to a dangerous situation, the original forces of safety are annulled. Thus, I cannot go along with the Majority's reasoning that because Justice OLIVER WENDELL HOLMES said something some fifty years ago, life and limb on the railroads of Pennsylvania should be denied the protection proclaimed by the sovereign state of Pennsylvania.

I bow to no one in my admiration for Justice OLIVER WENDELL HOLMES. There is no question that in the constellation of juristic eminence his star is a bright one indeed, but no jurisprudential astronomer has asserted that it was a star that shone all the time with impeccable infallibility. I personally know of an occasion when that luminary failed to scintillate with the sapient effulgence assigned to it by the Majority Opinion. I was one of the attorneys in the *Sacco-Vanzetti* case who called on Justice HOLMES at his home in Beverly, Massachusetts, to ask that he sign a stay of execution of the two doomed men. I had filed in the Supreme Court of the United States in Wash-

ington a petition for a writ of certiorari addressed to the Supreme Court of Massachusetts, averring that the two defendants had been denied due process of law under the Constitution of the United States. HOLMES refused to sign the stay, saying that the Federal government had no right to interfere in a purely state matter. His loyalty to Massachusetts and his instinctive wish that this grand old State should not be declared wrong before the eyes of the world, which had taken the *Sacco-Vanzetti* case to its heart, would not permit him to rise to the magnificent courage he had displayed in the case of *Frank v. Mangum*, 237 U.S. 309. In that *cause celebre* he had denounced the State of Georgia for allowing Leo Frank to be tried in an atmosphere of menace which dominated the deliberations of the jury. HOLMES admitted that Sacco and Vanzetti had been tried in the same kind of hostile atmosphere: "It was their (Sacco's and Vanzetti's) misfortune to be tried in a community that was stirred up, if not frightened by manifestations . . . and . . . I presume that the jury felt like the community."

Nevertheless, his chauvinistic pen remained in its holder when I, with my brother attorneys, presented the petition for the stay of execution to him, and thus two ill-treated working men were denied a review, to which they were entitled, in the Supreme Court of the United States. Three other justices must share the blame with Justice HOLMES in this failure of justice.

Accordingly, in spite of my never-diminishing admiration for Justice HOLMES's brilliant and historical career, I cannot bring myself to regarding him omniscient. Even HOMER nodded and it is clear HOLMES nodded in the *Sacco-Vanzetti* case. It is also apparent that a little drowsiness crept into his pen when he wrote the utterance which the Majority quotes with

the assurance that seems to say that, once HOLMES has spoken on a subject, all fountains on that theme may as well dry up. In point of fact, the well of state constitutional sovereignty did not empty with HOLMES'S pronouncement, or anybody else's pronouncement. The reservoir of state police power to protect the lives of the population within its borders has not drained simply because the Federal Government has legislated on the subject of railroads.

The Supreme Court of the United States acknowledged this fundamental truism in Federal-State relationship, when it said in *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440: "In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to *the health, life, and safety of their citizens,* though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' " (Emphasis supplied)

In *Head v. New Mexico Board of Examiners,* 374 U.S. 424 the issue for decision was whether the state of New Mexico could regulate advertising on radio in view of the Federal Communications Act. The Supreme Court said: "Without doubt, the appellants' radio station and newspaper are engaged in interstate commerce, and the injunction in this case has unquestionably imposed some restraint upon that commerce. But these facts alone do not add up to an unconstitutional burden on interstate commerce . . . Like the smoke abatement ordinance in the Huron case, the statute here involved is a measure directly addressed

to protection of the public health, and the statute thus falls within the most traditional concept of what is compendiously known as the police power."

The case we are considering here has to do with safety on the railroads. About the most fundamental rule that can be considered on proper railroad operation is the one that says there cannot be, and there must not be, two railroad trains or locomotives on the same stretch of track at the same time. This superlatively hazardous situation was immortalized in the ballad of *Casey Jones,* whose most telling stanza dramatically relates:

"Casey pulled up that Reno Hill,
He tooted for the crossing with an awful shrill,
The switchman knew by the engine's moan,
That the man at the throttle was Casey Jones.
He pulled up within two miles of the place
Number Four stared him right in the face.
He turned to the fireman, said 'Boy, you'd better
  jump,
'Cause there's two locomotives that's a-goin' to
  bump.'"

And the locomotives did bump. And Casey Jones went on to everlasting renown with the ever-recurring refrain:

"Casey Jones, two locomotives,
Casey Jones, that's a-going' to bump,
Casey Jones, two locomotives,
'There's two locomotives that's a-goin' to bump.'"

It is to prevent the bumping of locomotives or trains on the same track that a system of flagging has developed on the railroads of the nation. In the early part of 1964 certain railroads in Pennsylvania initiated a program to eliminate flagging. On July 22, 1964, the Railroad Brotherhoods, acting through some of its members, filed a complaint with the Pennsylva-

352

nia Public Utility Commission, protesting the elimination of flagging protection and asking that the commission order the reinstitution of "adequate and proper flag protection." Specifically the complaint asked that the commission require flagging protection "when a train stops under circumstances in which it may be overtaken by another train, regardless of whether or not such train or trains are operating under locomotive cab, automatic block or manual block signal system rules."

Fourteen railroad systems in Pennsylvania filed answers denying that there was any necessity for the flagging system, insisting that the automatic devices now in operation met the requirements of safety. The commission sat for many days taking testimony, which, in the printed record, covers some 2,000 pages. The commission found and so declared that the elimination of flag protection jeopardized the safety of the public and railroad employees. It accordingly ordered that "When a train stops under circumstances in which it may be overtaken by another train, a member of the crew must provide flagging protection, that is, go back immediately with a red flag, torpedoes and fusees by day and with a red and/or white light, torpedoes and fusees by night, a sufficient distance to insure full protection, placing two torpedoes on the rail and when necessary, in addition, display lighted fusees."

The railroad companies appealed to the Superior Court which affirmed the order of the commission, stating in its opinion that: "We do not exercise our independent judgment but only look to see whether the commission's findings are supported by substantial competent evidence."

The Superior Court found that the commission's findings were justified by the evidence. The railroads petitioned this Court for allocatur which was granted.

The railroads here ask that the order of the Pennsylvania Commission be vacated on the basis that Congress has, under the Interstate Commerce Act, preempted the field of train protection so as to preclude state regulation on flagging protection. Of course, we are bound, as the Superior Court was, to accept the facts as found by the commission.

In view of the factual situation declared by the commission I do not see how the Majority can conclude that the law requires a reversal of the Superior Court and the commission. Such a reversal means a Casey Jones collision with the decision of the Supreme Court of the United States in *Brotherhood of Locomotive Eng. v. Chicago, R.I. & P.R. Co.*, 382 U.S. 423, where the high court declared: "Congress unquestionably has power under the Commerce Clause to regulate the number of employees who shall be used to man trains used in interstate commerce. In the absence of congressional legislation on that subject, however, *the States have extensive power of their own to regulate in this field, particularly to protect the safety of railroad employees and the public.*" (Emphasis supplied).

In *Southern Pacific Co. v. Arizona*, 325 U.S. 761, the Supreme Court also said: "There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern."

How can flagging by reducing possibility of accidents restrict the free flow of commerce across state lines or interfere with it in any way?

The Majority Opinion states that "there can be no doubt whatsoever that the mechanical devices spe-

cifically required by §25 (of the Interstate Commerce Act) perform the exact same function that manual flagging is intended to perform." The answer to this statement is that there is no doubt whatsoever that the Interstate Commerce Act does *not* perform the functions manual flagging performs. The evidence presented before the Pennsylvania Commission proved conclusively that, with the mechanical devices, accidents occurred which would not have happened had there been flag protection.

The Majority makes no reference to the evidence in this case which, as I have already stated, covers some 2,000 pages. The Majority seems to gloss over the whole purpose of these proceedings. The Railroad Brotherhoods specifically pointed out how in the mountainous and habitually foggy areas which make up a large portion of the railroad areas in Pennsylvania, instantaneous flag protection is required if trains are to be brought to a stop, and this is particularly true because of trains of the Pittsburgh & Lake Erie and the Baltimore & Ohio Railroad "using the same tracks, which, in many cases have the view obscured by hills and curves."

The Brotherhoods produced evidence to substantiate their complaint that: "Any reliance by the railroad upon Automatic Block Signal Systems or other automatic devices is ill-conceived and ill-advised, as experience has shown that such devices cannot always be relied upon to prevent accidents of the type which the flagging rule is intended, and over the years has, actually prevented."

Automatic signalling by the use of track circuits first developed in 1872. The underlying principle of track circuiting is its capacity to detect and register the presence of a train, engine, or car on a track. The circuits are also designed to detect a broken rail, an

open switch, or an unclosed drawbridge. Automatic track signalling systems are designed on a "fail-safe" principle, whereby a break in or shunting of a track circuit will actuate a restrictive signal aspect.

This is all well and good but the evidence at the hearings in this proceeding revealed that at times deposits of foreign matter, such as sand, rust and grease on rails or on an engine or car wheels interfere with the intended circuit shunting. Undesired electrical connections between control circuits of associated signals may cause "false-proceed" signal aspects to be displayed and, in addition, certain lightweight track maintenance and inspection equipment will not ordinarily shunt track circuits.

The Superior Court, in reviewing the evidence submitted to the commission, stated that: "Automatic signal malfunctions may result in a 'false-proceed' signal, or a 'false-restrictive' failure, the latter involving a more restrictive signal aspect than is warranted by track conditions. I.C.C. records showed 58 false proceed failures in the United States on all railroads in 1964, while the Penna. R. R. reported 2,422 false restrictive failures on its system in one year. The Commission found that the elimination of flag protection jeopardizes the safety of the public and railroad employees and that flag protection *augmenting* that furnished by signals, was essential, whether the signals were manual or automatic."

Many witnesses testified to difficulties encountered with the automatic signal system. One telegraph operator, with 14 years experience stated that on three occasions, enginemen had difficulty reading a signal which displayed a red or stop block indication, "having interpreted the signal as displaying a yellow or restricting indication and on one occasion the train was operated beyond the signal, causing the engine to

run through a switch." It was discovered later that the sun's rays had been responsible for the "misreadings" and a longer hood had to be attached to the signal to shield the color light from the sun.

Another witness related an experience where "two controlled interlocking signals governing separate tracks at McKeesport displayed signal indication which were not properly reflected on the tower operator's panel board due to a malfunctioning of the signal system."

The phenomenal, almost miraculous development in the mechanical world, is leading many to believe that wheels, nuts, screws and bolts are more reliable than the senses of human beings. But from time to time airplane crashes, railroad wrecks and ship sinkings shock contemporary society into an awareness that insensate mechanics have not yet displaced homo sapiens. An official report of the Department of Transportation (which has now supplanted the Interstate Commerce Commission) recently gave graphic illustration how the failure to use manual flag protection caused the death of one railroader and serious injury to another. The report states: "On November 18, 1966, a rear-end collision occurred between two Terminal Railroad Association of St. Louis freight trains at St. Louis, Mo. *One employee was killed and one was injured.* The accident was caused by improperly permitting a train to enter an occupied manual block under a Clear manual block-signal indication, *failure of the carrier to arrange for adequate flag protection to the rear of the preceding* train, and failure of the engineer and conductor to operate the following train under control as required." (Emphasis supplied.)

The six printed volumes of testimony and exhibits in this case tell of many deficiencies in the mechanical signal system, all of which the Majority ignores, pre-

ferring to deal with theory rather than realities. I regret to say that it is my belief the Majority Opinion does not come to grips with the real problem in the litigation before us which has to do with the most momentous proposition on earth, namely, the preservation of human life. The Majority Opinion scarcely ever acknowledges that vital feature in the controversy between the railroad companies and the railroad Brotherhoods.

One can never, or should never, fail to realize that railroading is an extra-hazardous occupation. Fortunately and gratefully we recognize that railroad tracks are not the gory battlefields they once were, my father and two of my brothers having been railroaders. Still we cannot overlook that, with all the safety devices current, potential slaughter, maiming and crippling still stalk the ties and rails. We still look with sorrow on pictures in newspapers and on television screens of trains which have telescoped, of locomotives overturned, of blanketed forms lying on the ground, and ambulances clanging away carrying the injured and the disabled from railroad wrecks. Thus, every possible protection which can stave off these heartrending events should be welcomed by the railroads, not opposed.

The Majority Opinion says that there can be no doubt whatsoever that the language of §25 indicates that Congress has chosen to regulate the entire field of rear end collision preventing. The answer is that there is nothing in §25, or any other part of the Interstate Commerce Act, which imposes any obligation to provide flag protection. Congress, by limiting its control over collisions to block signal, interlocking, automatic train stop, train control and cab-signal systems, has left the requirement of manual flag protection, where it has been since the first railroad was built, exclusively to the States.

The Majority Opinion states that, once Congress has decided how best to avoid one train from running into another, "it is no longer open to the states to decide that the federal protections are inadequate." But it is not a matter of States determining inadequacy on the part of the Federal government. It is a matter of a State discharging its constitutional duties to offer the utmost safety to its people. The United States does not have authority over a single square inch of territory in the States which it does not get from the Federal Constitution or laws passed thereunder. The Supreme Court of the United States said in *Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218: "we start with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

Thus, when Federal legislation says nothing about flag protection and there is no evidence that flag protection can do other than help to prevent train collisions, it is folly to argue that the State must allow carnage on the railroad tracks when it has the means to avert it.

Since Congressional legislation does not prohibit flag protection, the railroads would, in order to maintain their position, have to prove that flag protection interferes with the mechanical devices or in some way renders them ineffective or less protective. There is nothing in the voluminous record to support any such bizarre conclusion. Why, then, deny to Pennsylvania the right to help in saving the lives of its citizens?

Then, the Majority says that since, under §25, the Interstate Commerce Commission may also require "'other similar appliances, methods and systems intended to promote the safety of railroad operation,'" this means that it could, if it wanted to, require flag-

ging. What it could or could not do is not the issue in this case. The fact is that Federal legislation or regulation does *not* provide for flag protection. To argue that Congress could provide for flag protection is like saying that it could also provide for additional fire engines after a conflagration has levelled a city in which a federal installation is located.

We are here dealing with realities, not theories; with danger on the railroad tracks, not abstractions in a philosopher's study.

The Majority founds its whole case on preemption. Preemption means monopoly and monopoly is a serious proposition. To say that the Federal Government with its limited, derived powers may monopolize a subject against the unlimited powers of the sovereign states is to make a monumental assertion. Of course, there is preemption, and there must be preemption, in certain fields under our dual form of government. However, where preemption is asserted it cannot be implied, it must not be left to interpretation, much less surmise. The Majority Opinion does not deny that preemption on flagging protection by the Federal Government is not spelled out in the Interstate Commerce Act. In fact, it is not even mentioned.

In *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148, the Supreme Court stated: "When the prohibition of state action is not specific but inferable from the scope and purpose of the federal legislation, *it must be clear that the federal provisions are inconsistent with those of the state to justify the thwarting of state regulation.*" (Emphasis supplied) There is nothing in the language of §25 which is inconsistent with the employment of flagging by the State in order to further carry out the objectives of both Pennsylvania and the United States to save life. Why then does the Majority insist on thwarting Pennsylvania legislation?

The United States District Court for the Eastern District of Louisiana said in the recent case of *Pearce v. Freeman*, 238 F. Supp. 947, that "If it (Congress) chooses to circumscribe its regulations and occupy only a limited area in a given field, it leaves to the states the right to regulate outside of that limited area."

In *Locomotive Engineers v. Chicago, R.I.*, 382 U.S. 423, 34 Law Week, 4103, 4104, the Supreme Court said: "In the absence of congressional legislation on that subject, however, the *States have extensive power of their own to regulate in this field, particularly to protect the safety of* railroad employees and the public." (Emphasis supplied)

In the face of all these authorities, I cannot grasp the significance of the Majority decision. It insists on running on the same track occupied by all the authoritative precedents I have here cited, and there are very many more. I see here a Casey Jones collision between law and arbitrariness. I see here a forcible exercise of judicial power which I fear may be the cause of accidents. Apart from the fact that I could be a passenger on one of the trains derailed and wrecked because of the absence of flagging protection, I feel content in the fact that I am not part of the wrecking crew working on dismantling the track of harmonious cooperation between the United States and the States.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I disagree with the majority's conclusion that §25 of the Interstate Commerce Act, 49 U.S.C. §26 (1958), has pre-empted all state regulation in the area of flagmen protection in order to promote the local safety of railroad operation.

In support of federal pre-emption, the railroads and the majority opinion rely most heavily on *Napier v.*

*Atlantic Coast Line R.R. Co.,* 272 U.S. 605, 71 L. Ed. 432 (1926), where the United States Supreme Court struck down state requirements for cab curtains and automatic doors to fire boxes on the ground that Congressional enactment manifested an intention to occupy the entire field of locomotive equipment. The inapplicability of *Napier* to the instant situation has recently been decided by the Supreme Court of New Jersey in *In Re Complaint of Brotherhood of R.R. Trainmen, Pennsylvania Railroad v. Public Utility Commissioners of New Jersey,* 49 N.J. 174, 229 A. 2d 505 (1967). In deciding the identical issue presently before our Court, Justice JACOBS, writing for a unanimous New Jersey Court commented: "Napier has never been applied as broadly as the Railroads contend (cf. Terminal R. Asso. of St. Louis v. Brotherhood of R. Trainmen, 318 U.S. 1, 4, 63 S. Ct. 420, 87 L. Ed. 571, 576 (1943); Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 766, 65 S. Ct. 1515, 89 L. Ed. 1915, 1922 (1945)); in any event it dealt, not with supplemental local emergency safety device, such as flagging, but with equipment attached to the locomotive which passes through from state to state and with respect to which the national interest in uniformity is vital and paramount. Similarly, the very Congressional language (49 U.S.C.A. §26(b)) points to the block signal systems themselves and to similar appliances where national uniformity is the concern rather than to local safety requirements which do not impair the design or sweep of the federal regulations.

"In Florida Line & Avocado Growers v. Paul, supra, the Supreme Court pointed out that federal regulation of a field in commerce should not be deemed preemptive of state power in the absence of persuasive reason—'either that the nature of the regulated subject matter permits no other conclusion, or that the

Congress has unmistakably so ordained.' [Citations omitted.] And in Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., supra, the Supreme Court, in upholding a state full crew law as against a claim of preemption, noted that in the absence of Congressional legislation as to what number of crew members, 'the States have extensive power of their own to regulate in this field, particularly to protect the safety of railroad employees and the public.' 382 U.S., at p. 429, 85 S. Ct., at p. 597, 15 L. Ed. 2d, at p. 505. Indeed it may be said that state regulatory provisions having local safety as their objective are the least likely to be held preempted. [Citations omitted.]; see also Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra, where we stated that we were not convinced that there is merit to the Pennsylvania's contention 'that Congress has occupied the field of automatic block signals to the total exclusion of any state safety requirements bearing thereon.'" 14 N.J., at p. 434, 102 A. 2d, at p. 630.

While I recognize the supremacy of federal legislation in areas partially occupied by Congressional enactment, it is not always clear and at times most perplexing to determine whether it was the Congressional intent to occupy the entire area. In *Rice v. Santa Fe Elevator Corporation,* 331 U.S. 218, 91 L. ed. 1447, the Supreme Court of the United States enunciated the conflicting values and guidelines which must be assessed before determining questions of federal preemption. Justice DOUGLAS, speaking for the majority of the Court remarked: "So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611, 71 L. ed. 432, 438, 47 S. Ct. 207; Allen-Bradley Local,

U.E.R.M.W. v. Wisconsin Employment Bd., 315 U.S. 740, 749, 86 L. ed. 1154, 1164, 62 S. Ct. 820. Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. [Citations omitted.] Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Hines v. Davidowitz, 312 U.S. 52, 85 L. ed. 581, 61 S. Ct. 399. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. [Citations omitted.] Or the state policy may produce a result inconsistent with the objective of the federal statute. Hill v. Florida, 325 U.S. 538, 89 L. ed. 1782, 65 S. Ct. 1373. It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide." [Citations omitted.]

After carefully analyzing and evaluating the relevant considerations outlined in *Rice,* I am drawn to the conclusion that §25 of the Interstate Commerce Act does not preclude state regulation in the nature of flagmen protection.

Moreover, the majority opinion, in my view, misconstrues the language of §25 by concluding that the language used therein is broad enough to indicate that Congress has chosen to regulate the entire field of rear end collision prevention. Section 25 provides in pertinent part as follows: "(b) The Commission may, after investigation, if found necessary in the public interest, order any carrier within a time specified in the order, to install the block signal system, interlocking, automatic train stop, train control, and/or cab-signal de-

vices, and/or other similar appliances, methods, and systems intended to promote the safety of railroad operation, which comply with specifications and requirements prescribed by the Commission *upon the whole or any part of its railroad . . . Provided further*, That a carrier shall not be held to be negligent because of its failure to install such systems, devices, appliances, or methods *upon a portion of its railroad* not included in the order, and any action arising because of an accident occurring *upon such portion of its railroad* shall be determined without consideration of the use of such systems, devices, appliances, or methods *upon another portion of its railroad*." (Emphasis supplied.)

The use of the language "upon the whole or any part of its railroad" indicates that Congress only intended to empower the Interstate Commerce Commission to regulate the installation of safety appliances, methods, and systems which have some physical connection with the actual railroad cars or its appurtenances. Section 25 in no way confers authority on the Commission to promulgate rules and regulations with respect to safety devices which are not affixed "upon the whole or any part of its (referring to the carrier) railroad." The result achieved by the majority today for all practical purposes renders the meaning and purpose of that language nugatory inasmuch as its interpretation of §25 ignores what I think was the obvious intent of Congress, i.e., to preclude state regulation with respect to equipment attached to the railroad where the need for national uniformity is most vital to the national interest.[1]

What else could Congress have intended by its inclusion of the language "upon the whole or any part

---

[1] This construction of §25 is further substantiated by a reading of paragraph (e) under the Act which provides as follows: "It shall be unlawful for any carrier to use or permit to be used on

of its railroad" since it could have arrived at the same result reached by the majority of this Court by the simple method of excluding that language from the Act? For these reasons I would affirm the judgment of the Superior Court.

I dissent.

Mr. Justice EAGEN joins in this dissenting opinion.

---

its line any system, device or appliance covered by this section unless such apparatus, with its controlling and operating appurtenances, is in proper condition and safe to operate in the service to which it is put, so that the same may be used without unnecessary peril to life and limb, and unless such apparatus, with its controlling and operating appurtenances, has been inspected from time to time in accordance with the provisions of this section and is able to meet the requirements of such test or tests as may be prescribed in the rules and regulations provided for in this section."

Based upon the foregoing, it is extremely difficult to understand how the majority of our Court could arrive at its conclusion. It seems so obvious that Congress only intended to permit the Interstate Commerce Commission to regulate certain equipment and/or mechanical devices and their appurtenances and never intended to include under this Act regulatory power with respect to flagmen protection. Every word used in paragraph (e) refers to some sort of mechanical device and not one word therein relates to or encompasses the manual waving of flags to prevent rear end collisions.